May it please the court, my name is Susan Marie Weber, I am the appellant in this particular case. I'd like to take a few minutes to explain why granting summary judgment in this case was in error and reserve the rest of my time for rebuttal. I filed this particular case after the Caltech MIT computer scientists published their results of a voting technology report. Their warning was of a possibility of an entire election being overthrown without being detected under a touch screen paperless voting system. This is why I filed my lawsuit. I was appalled, I asked and my friends asked me, how likely is it that an entire election can be overthrown? There's four people who cannot answer this question. I can't answer this question, registrar voters, Michelle Townsend can't answer this question, Secretary of State cannot answer this question, nor can Judge Wilson answer this question. Who is qualified to answer this question? Only the computer science experts. And what do they say? They say that the risk of detection is impossible because there is no audit possible when there is a paperless voting system. The stakes are high in this type of a system. And they conclude that using a computer to run an election without a voter verified audit trail is not reasonable. So is your argument, Ms. Weber, that when the Secretary of State who is the person committed by law as the certifying official for the accuracy and reliability of voting machines made the certification that this type of equipment was acceptable, that that is error, and that on your 1983 action we can overturn the Secretary's certification? I'm not here to discuss the certification. I'm here to discuss a system that does not include a voter verified audit trail. That's not my question. My question is really a pretty simple one. I think what you're asking us to do is to say to the Secretary of State, you were wrong to certify this touchscreen system because it's not accurate or reliable. I can't answer that question. I don't know that you can answer that question. But they did this whole thing without computer experts involved in this particular selection. I understand that. But the question is in the context of a federal civil rights suit, we have to find first that there is a significant constitutional violation here, and then you have to ask us for some relief. I would say that under Burdick this has to be viewed with strict scrutiny and held unconstitutional because there are so many, many people involved in this versus the ones they are trying to protect. How do you distinguish the language in Burdick that says that strict scrutiny does not always apply to the various determinations as to what particular voting methods might be used? I'm sorry, tell me again. There's some language in Burdick that says that strict scrutiny is not always applicable in the context of an election law challenge such as the one you're bringing today. How do you distinguish that language in Burdick? If I'm defining this as an unreasonable system, then it has to be viewed under strict scrutiny. And I'm defining it as an unreasonable one because it has no audit trail. I'm an accountant. I look at audits all the time. This system has no voter verified audit trail. It is a paperless system. It is in a black box. The only people who know anything about this computer system would be computer experts. The people who were excluded from the choice of this system were computer experts. And they have continued to be excluded during all the discussions of these issues that have been brought up. So, if I could continue for just a moment. My experts provided admissible evidence on this very material issue. Their testimony was ruled inadmissible because it did not relate to non-material issues such as residual vote rates, which is under-voting and over-voting, foreign language ballots, and the accuracy of the counting of a machine-created ballot. They were excluded because they didn't discuss this issue. Their testimony was ruled inadmissible for those reasons. They were talking about the very important core and the heart of this whole case is the fact that there is no voter verified audit trail. And their evidence all focused on this instead of what the judge ruled as being inadmissible. So, I'm saying that the testimony that was representative of these experts should have been admitted by the court below. And that the defendant's refusal to provide a voter verified audit trail should have been examined under strict scrutiny for these reasons. Mr. Weber, what's the difference between an audit trail and the ability to have a recount? Because I understand that these machines do provide images which may be printed out for recount purposes. These voting systems create the ballot, count the ballot, and then tell us how the answer came out. Give us the result. There is no voter verified paper document that I can see when I'm voting. All I see is a computer screen. There is no paper that I can actually say, I don't even need to hold it. I can just see it and say, yes, that is how I voted. It drops into the ballot box. It becomes a ballot of record. If anybody contests this or if anybody has any questions, we all can see this paper. Right now, the way the system exists, it's in a black box. The computer knows what's going on. None of us know what's going on. The computer tests itself and checks itself. But none of us know what's going on. There aren't any other questions? Your contention that basically as a matter of constitutional principle, elections have to be handled in pen and paper? Elections should be transparent, yes, so that we can all see what's going on. When only a computer programmer knows what went on in an election, that's just plain wrong. Just wrong. Let me ask you a more practical question. Did you try to petition the local election officials in Riverside County? We went in front of the Board of Supervisors. Now, they don't know how a computer system works. They relied on Michelle Townsend, who relied on vendors. And vendors sold this product. No computer scientists at that time were involved in it. Computer scientists have come out of the woodwork since then saying, my God, what's going on here? This has to stop. And we waited and nobody stopped it. So we had to file a lawsuit. Wouldn't one of the ways to solve your concern be to simply attach printers? Yes, that's one way. And did you ask the Board of Supervisors to do that? Yes. And did they refuse? Yes. I see. And can you tell us whether there's any case authority that you can support your argument with that this is constitutionally required? This is the case of first impression. Computer voting has only been around a short time. Would it be unconstitutional if you lived in that small town up in New Hampshire where primaries used to always start to cast a ballot this way by raising your hand? You're asking me what I think would be constitutional on a voting system? Well, obviously voting systems have improved quite a bit because some people did not want to share with others the whole amount with their hands. Would it be unconstitutional if you had a small enough area to do it to just have a show of hands? I don't know the answer to that question. My desire, of course, would be to go back to paper ballots. Well, you've mentioned entirely that the absence of a paper ballot in and of itself is unconstitutional. The answer to your question is the lack of a voter-verified audit trail. Not a computer-generated audit trail. I'm not saying that there has to be a paper trail. There has to be a voter-verified. If we were all standing in a room, all of us voters would verify that, yes, we saw 12 hands standing up or not standing up. Okay. All right. Thank you. Mr. Jones? Mr. Woods. Excuse me. May it please the Court, my name is Doug Woods. I'm with the Attorney General's Office. I'm here on behalf of Secretary of State Kevin Shelley. We have a summary judgment in this matter because there was no genuine disputed material fact below. What we had was plaintiff's value judgment of the characteristics and features and touch-screening systems that were at issue. Well, it would help me if you would clarify something. The declarations that the Secretary submitted indicate that ballots at any time can be reproduced and printed out on paper at the request of an election official, at least for purposes of a recount. Is that correct? That is correct, Your Honor. Every vote that goes into a touch-screen system is recorded. There's a mark on the data history that goes in two different places, one in the voting cartridge and then two in the actual hardware of the machine itself. It's stored redundantly. And what happens is that information is stored and every single ballot can be reproduced individually by the push of a button after the election. So the complaint boils down to what Ms. Weber says is the ability of the individual voter to verify, to make sure that the ballot that that voter has cast is actually physically or is actually recorded by looking at something physical. The plaintiff's complaint boils down to the fact that it is the computer that is tallying the vote that is received by the computer rather than the computerized tallying processes receiving the paper ballot in the ballot box. Okay, that problem is solved by the fact that you can produce a printed, a hard copy of it if there were a recall and if there were a challenge to it. That's correct, Your Honor. But if what her complaint is instead that when I go into the voting booth or basically go up to this touch screen in the library and I punch in who I want to vote for, even though I am asked at the end of the trail whether that's really what I want to do, and I say yes, that doesn't suffice because you need to have a piece of paper to look at and make sure that the computer registered what you inputted. I think Your Honor is right in characterizing what her complaint is and it really boils down to a degree of trust that plaintiff has in the people process, in the people process of collecting the ballots in the box, getting that to the counting center, running that through the processing machine and getting a computerized vote tallied from that process versus the trust that she doesn't have in the touch screen machine to receive the information that the voter puts in and have that information come out when the votes are tallied. It's a degree of trust. Now, recognize this is an important point. Recognize that everything that plaintiff is saying is at an abstract level of observation. All plaintiff is saying is I'm not sure that my vote is being counted when I punch a button or touch a screen on a touch screen machine. The same abstract criticism could be made of any voting system. And so it's important to recognize that we're talking about a summary judgment motion. We put together a motion saying here are the layer upon layer upon layer upon layer of protections, security protections against intentional fraud, manipulation, accidental glitches, propping machines from 10-story windows. These are the rigorous tests that were applied to these machines. We put all that into the record on a summary judgment motion and the plaintiff with her experts whose testimony was not excluded, it was considered by Judge Wilson and considered not to create a disputed issue. But plaintiff and her experts say, you know what, we're just concerned that somebody could tamper with this process and as a result the votes may not be tallied accurately. And the level of abstraction that we're talking about is just insufficient to defeat a summary judgment motion in the face of the layer upon layer upon layer of reasons that the systems are secure. Isn't it true, Mr. Woods, that the DRE system is supposed to, research shows that it is more accurate in recording voters' choices than any of the existing systems? That's correct, John. We've all, I myself am painfully aware of the process we went through with the punch card systems and having to defend their continued use for a period of time up through including yesterday. The momentum is away from the punch cards. In fact, doesn't federal law require that every polling place have a DRE in it by 2006 to aid people with disabilities? That's correct, John. And I've got to be careful because the Secretary of State has certified a number of systems and I don't want to favor one system over another. All the systems that are certified are qualified for use and the counties in their judgment can exercise their values about the pros and cons of each system when it's appropriate. The touchscreen systems have particular advantages that are particularly helpful where there are voters with disabilities. There are counties with multiple language requirements. There are a number of other advantages. It's easy to use. It's like an ATM system. The elimination of spoiled, mismarked, and overvotes, spoiled, mismarked, balanced, and overvotes, all contribute to reducing the residual vote rate which can be considered a rough proxy for error rate. There are a number of advantages to the touchscreen system. But she does have one point, Mr. Woods, and if I understand it correctly, if you compare it with the punch card, the voter can simply take the card after they have used the stylus and see whether or not the hole was actually punched in the card for the box that they checked. Whereas with the computer system, as I understand Ms. Weber's concern, you can request a printout which will give you a paper record of an electronic file, but there isn't any other way, as I understand her argument, to verify that what's in that electronic file is, in fact, the vote that was cast by the voter. By the same token, think about the level of abstraction we're talking about. Once she casts her paper punch card or optical scan or data vote ballot into the ballot box, if she comes back later in the afternoon, how can she be sure? Right. Somebody could take it out and put a whole bunch of votes going the other way in its place. She may not read it. And she may not check. I say by the same token, as in a criticism at that level of abstraction would apply to any of the systems. Certainly the Secretary of State's position in every registrar in California would say that that couldn't happen with the punch cards either. And so I always want to be clear about that. The systems are secure, the layer upon layer upon layer. In part, it's the software that set up the redundant savings, the digital signatures, the encryption. In part, it's the hardware. You can't get into the touchscreen system while it's sitting there. It's a standalone system. It's not networked. There's no modem hooked up to it. It's not a PC. And in part, it's the people. There are people overlapping and secure responsibilities. They're responsible for putting together the ballot definition locally and at the Secretary of State's office. There are people at the vendors responsible for making sure it all works. And there are checks and balances in terms of people's responsibilities. And then, of course, there are the people securing the systems in advance of the election. There are people working the polls. No one's going to be able to take a hacksaw out of the machine and start switching wires around. Layer upon layer upon layer is security. I'm running short on time. I have one point that I want to add that I want to make clear, and that is, in a sense, the plaintiff is preaching to the choir. The Secretary of State is interested in accomplishing voter-verified paper ballots. He sees the benefit of doing that for the sake of easing concerns, if nothing else. There are obstacles to doing that right now. A couple of the vendors have prepared prototypes. They have not gone through the testing process. There are downsides for any individual county registrar who would want to implement the addition of a printer that would create a voter-verified paper ballot. You would need more space at the polling place. You would need more space at the warehouse. You would need more battery power to cover the additional draw from the printer. The battery power would make the systems more heavy. It would be tougher on the poll workers. It would be more expensive, probably about 25 percent more expensive. Each of these units is several thousand bucks. All of these are downsides. Printer jams. Every element that you add to the voting process creates a complication, creates a potential point of disruption in the voting process. If a printer jams, poll worker has to come, start pulling paper out, slows everything down, conceivably hurts the privacy of the ballot, looking at the ballot in the course of getting it out of the printer. These are downsides. One other important downside, and that is that there are equal access requirements for the blind and visually impaired. Those are in the Help America Vote Act. Those are in the Americans with Disabilities Act. Those are within the California Elections Code. The touchscreen systems are the first systems to allow visually impaired and blind voters to vote independently without assistance. Huge celebration. Huge celebration. If we go to a voter verified paper ballot addition to a touchscreen system, that would run afoul of the equal access provisions because what we would be doing is giving a feature to seeing voters that we would not be giving to the visually impaired. They would have to choose between independent voting or assisted voting with the voter verified ballot. Okay, thank you. Just one last question, and that is, should we change the case name here from Jones to Shelley? Is it done? Because we're still carrying it under Jones. The Secretary stated Kevin Shelley, and I haven't taken care of that procedural. Okay, thank you very much. Ms. Weber? I mean, if I can, as well as the other gentlemen. Excuse me. A couple of items here. It's true that the ballots can be reproduced and recounted, but that's the very fact that we're arguing here is that the computer generated the ballots, and now the computer is going to reproduce them, and the computer is going to count them again. The voter in no way verified that ballot, so we still can't presume that the vote is being counted correctly. A glitch can store the information incorrectly, and the computer will print out incorrect information. A comment was made about the accuracy. In this case, a computer can be accurately wrong, and it can be accurately correct. A computer only repeats what it's been told to do. It's just a machine. And this case is not about a machine. This case is about a lack of an audit. And an audit, by any definition, is somebody has to verify the document. We're asking that the voter verify the document. Can you imagine what would happen if the IRS came to me and said, I'd like you to prove to me that you had these gas expenses? And I said, sure, and I pushed my computer button, and out comes this little report and says, here's the total of my gas expense for the year. They're going to laugh themselves silly and say, no, we want to see the source document. We're doing an audit, and we have to see the paper document. They would not accept a computer-generated report, neither should we in any voting system. And the issue here is the ability to audit. It is not about a machine. It's un-auditable by every standard, GAO, accountants, everybody. It's un-auditable because there is no source document verified by the voter. Okay, thank you, Ms. Weber. Ms. Woods, the matter just argued will be submitted. The next matter on calendar is Aguilera v. All of These. Hello, Aguilera. Okay, thank you. Good morning. May it please the court. My esteemed colleague and I, John Osnoff, have been litigating this very interesting issue. You've had a couple good issues this morning, and I hope this one is equally entertaining. This case addresses the issue of whether a legal permanent resident in deportation proceedings withdraws his appeal by making a brief, casual, and innocent departure from the United States. On writ of habeas corpus, Magistrate Judge Sloreski made two findings. One, the case is controlled by the U.S. Supreme Court decision in Flutie v. Rosenberg, and that the petitioner made a brief, casual, and innocent departure as required by the Flutie doctrine. District Judge Real rejected the magistrate's conclusion because the Ninth Circuit had no precedent on this issue. So here we are. You know, for starters, the regulation does not have a brief, casual, and innocent exception. Right. Does it have an intent requirement of the sort that precipitated the brief, casual, and innocent loss in Flutie? So how do you get us to write that kind of exception onto the regulation? Okay. There are two ways to do it. As I pointed out in my brief, Judge Sloreski, you know, wrote a beautiful report and recommendation. That didn't take account of either thing I just said. Yes. Yeah. But I think for my case, I think the stronger argument really comes out of the fact that there is no statutory basis for the regulation. That's, I think, if there's one thing I can tell you today that really bothers me about this regulation is that there's no statutory underpinning from it. What do you mean specifically when you say that? Because it's obvious that the Attorney General, now the Secretary of Homeland Security, but anyway, whoever's in charge of immigration has got just a ton of authority to deal with immigration. Okay. We know that. Yes. So what do you mean exactly when you say there's no statutory basis for it? Congress has never, ever said or created a statute that basically says the Attorney General or the government, the executive branch, you know, like that, may unilaterally withdraw an appeal upon departure. In fact, the statutes are exactly against that proposition. But we do have a, well, we do have case law under the habeas corpus statutes that say that if you depart and you are no longer in custody, then we lose jurisdiction in habeas corpus over the body because we no longer have it. Let me correct you on that, Your Honor. I recently litigated that issue and the Ninth Circuit recently published on that issue. The case was Zegara-Gomez. It came out recently. The holding is that if the person files his habeas petition for writ of habeas corpus prior to the deportation, habeas jurisdiction remains. He just litigated that. That was me. So I'm fairly, I feel pretty solid on that. What I want to direct your attention to. I'm aware of that case, but remind me, I think there were some factual differences, were there not, between this situation? Oh, yeah, yeah. I think that your particular concern in Zegara-Gomez's case doesn't touch upon this particular issue because when the petitioner returned to the United States, he was incarcerated by the border authorities, the former INS inspectors, and he was within INS's jurisdiction when we filed the writ of habeas corpus, and he's out on supervised release, and so there's no issue of him being outside the country for purposes of the habeas jurisdiction. But in terms of the BIA jurisdiction, which is what this case is about, the BIA's jurisdiction over his appeal, the strongest, I think, single argument to have is that Congress, 8 U.S.C. 1101 A-20, said that a legal permanent resident remains a legal permanent resident until such time as the BIA renders a final decision in the case. Sure, but this is just one other way of rendering a final decision. I mean, that is, if you self-execute the deportation order, you've done it. I mean, you've done it. You've deported yourself. You haven't deported yourself, Your Honor, because as a legal permanent resident, you are not in the same position as an undocumented alien. A legal permanent resident can live in the United States, can work in the United States, and can travel in and out of the United States. Until you commit an aggravated felony, and then you are no longer eligible to maintain your status as an LPR. We deport you, and we never let you back in. Right, but he was not deported. He had an appeal pending, and the statute specifically says you retain all the rights and privileges of legal permanent residents until there's a final administrative decision. That final administrative decision did not come until after he exited and came back in. He didn't deport himself. He's ordered to be deported. He appealed. He deports himself. He doesn't deport himself. He makes a brief, casual, and innocent departure, as the Supreme Court included held, and as the Congress intended. But isn't the brief, casual, and innocent departure an exception that we recognize for purposes of maintaining the claim of continuous residence? That's an exception that really isn't applicable here. It is to prevent the poor alien who's trying to establish seven or ten years of continuous residence from losing that credit by making a brief, casual, and innocent trip to Tijuana to go shopping. It seems to me this is a different case. This is a case where the defendant is alleged to be an aggravated convicted felon. He's ordered deported on that basis, and during the pendency of his challenge to that deportation order, he deports himself. And there's a regulation that says when that happens, we treat that as an abandonment of your challenge, and now your deportation is final and complete. You're gone, and we can't let you back in because you're an aggravated convicted felon. You're no longer eligible to remain in the United States. To the Attorney General, I have to say, tough. I know what you're trying to do. I know you want to kick out this aggravated felon who has a deportation order and whose appeal is pending, but he's still a legal permanent resident. You cannot strip that from him. You can if he is found to have been convicted. You can. The executive cannot do it. The statute prevents the executive. Congress has told us that people who have aggravated felony convictions cannot remain in the United States. But Congress also says, by definition, a legal permanent resident may not be stripped of his rights prior to a final administrative decision. And one of those rights is to travel. When he deports himself. It does not become final because he, the individual, has no intention of giving up his appeal. That's the whole, I think, the whole basis of the Supreme Court's decision in Flutie is that unintentional breaks in residence are not. Sure, because that was part of, that's part of the statute. It's part of the statute there. I mean, the statute was different. Why is there any, what I don't see is why anything is different right now. He's not allowed to remain if he can establish continuous residence. He's not, he is not under the disability of being a convicted aggravated felon. The only issue we're worrying about in Flutie is that this poor alien established continuous residence. Actually, I think you're misreading the fact of Flutie a little bit. Because Flutie was also a legal permanent resident. When he left and came back from a two-hour trip to Ensenada, my client made a two-hour trip to Tijuana. When he left and came back, the authorities said, hey, you're a homosexual. You have a psychopathic disability. We're not going to let you into the United States. Again, it was a legal permanent resident. And the Supreme Court looked at this and said, hey, as much as we don't like homosexuals and as much as we don't like all this, this gentleman did not intend to give up his residency and his rights in the United States by taking that two-hour trip. Similarly, the petitioner did not intend... The difference is he was not then otherwise deportable. He was deportable if the INS... Because if you look at Flutie, there were two instances where Mr. Flutie had exited and entered the United States. On the first one, the particular border inspector didn't really care that he was a homosexual. On the second one, he did. And he enforced the law, the same law that... The same type of law that Congress passed against such people coming into the United States, wanting to take such people out of the United States, and the Supreme Court said no. He's a legal permanent resident. He has rights. He did not relinquish his rights by taking that short two-hour trip. In the same vein, the magistrate judge and other courts, the Supreme Court, and you'll have to forgive me because I want to let this court know that recently, while doing research on a completely different case, I found a Fifth Circuit case from 1993 that none of the parties, and not even Magistrate Judge Zarefsky with all his research, he found a Second and a Fifth Circuit case, but not this particular one. The case is Molina v. Sewell, 1983, F. 2nd, 676. Fifth Circuit case. Yes, 983, F. 2nd, 676. Fifth Circuit, 1993. Which is very, very close, the circumstances in this case, in that immigration proceedings were pending at the time of the departure and the return. And the analysis, I don't have to go into it very much, but the analysis is basically just a fluity analysis. We'll read it. You're quite over time. Yeah. Thank you, Your Honor. I appreciate it. Good morning, Your Honor. May it please the Court, I'm Joanne Offenhoff, Assistant United States Attorney, representing the respondent appellee. The appellant in this case is a criminal alien, convicted of cocaine possession while carrying a concealed firearm. As a result, he was placed in immigration proceedings and ordered deported. After being ordered deported, he voluntarily left the United States, crossed the border, and entered Mexico. And by leaving this country and crossing the border, he executed that order of deportation. This court, in U.S. v. Blaze, found that when a person under a deportation order voluntarily leaves the country,  His BIA appeal is withdrawn, and any stay of execution is no longer effective. In that very case, the court cited approvingly Alamon v. Fierro. Pardon me. Alamon Fierro v. INF. There, too, the court held that where departure is strictly voluntary, Regulation 8 CFR 3.4, which now has been renumbered and is now appearing in the Code of Regulations as 1003.4. But that regulation served to withdraw the appeal. In this case, there is no question that the appellant's departure from the United States, his crossing of the border, was strictly voluntary. Therefore, like Blaze and Alamon Fierro, that crossing withdrew his appeal and effected his deportation under 3.4. Maintenance of one's status as a lawful permanent resident depends upon compliance with the immigration law. Aliens convicted of aggravated felonies, such as the alien in this case, become subject to deportation. Where the alien effects that order by leaving the country, there is no purpose in continuing his BIA proceeding. Regulation 3.4, now known as 1003.4, is a valid regulation which supports judicial efficiency, case management, and finality. If the court has any questions, I'd be happy to answer them. In the proceedings below, was there ever an attack on the legality of 1003.4? No, Your Honor. As opposed to the discussions under Flutie as to whether an exception applies. Excuse me for interrupting, Your Honor. No, there was not. The argument made by the appellant with regard to the validity of the regulation appears for the first time in the brief filed with this court. Okay, thank you. Thank you very much. I'm sorry for your argument in this matter. The matter just argued will be submitted. All right. The next here argument is Hansel v. Kayline. Mr. Irving? Good morning. May it please the Court, I'm Tom Mead. For the appellant, Kayline America, we go by the appellation of CAM. So when I refer to that, you will know what I mean. We do not have any sophisticated legal issues in this appeal. I consider myself fortunate in that respect because the level of scholarship the panel displayed in the first case was intimidating. So we are taking up, if I may, I'd like to reserve five minutes for rebuttal. We are there are two fuzzy areas, I think, in the California law as it applies to this situation. We're not trying to push the envelope, even if it could be pushed on those two areas. We are appealing from the only one aspect of the summary judgment for the other side against us below. There's only one issue in the case. We're not replowing any old ground. We are simply appealing the ruling of the case of the district court that there was no coverage for CAM's 1998 claim for its 1996 negligence, according to a condition in St. Paul's 92 policy, which was a claims made policy. And the condition was that where the where the act, the negligence act and the claim are in different policy periods. There's coverage only where the insured could not reasonably foresee a claim. And then we get to the disputed words at the time this policy took effect. Was there an explanation for why your client did not put the insurance company on notice of the Taiwanese litigation? Yes, there's several. One is there was no notice provision in the policy for. So they didn't think they had to until they actually suffered an adverse judgment. And the other. Well, until they had a claim. And the they're also the second reason is there was no application process. So unlike our let's call them primary insurer. There was no application submitted each year for renewal of the policy in which you would have put in answer to question. Do you have any possible pending claims? So there being no notice provision for possible claims, there being no application submitted. There was no process for putting them on notice. But and I think this is where the district court went wrong because the same question came up in the district court argument. I didn't present notice makes no difference here. We couldn't save ourselves. We couldn't bridge the coverage gap by giving notice. It made no difference because there was no savings clause for a cause in the insurance industry. A discovery clause where you could give notice of a possible claim, thereby protecting your coverage. This policy did not contain such a discovery clause. So had we given notice that there was some possibility of a claim, it would have been totally gratuitous and it would not have done us any good as far as coverage. Is your position that the only notice that the insured have to give is at the outset when the original policy of insurance was procured and presumably the insured through its broker was asked whether it had knowledge of any potential or pending claims out there? Yes, partially is the answer. And so in 19, well, I guess the insurance actually went back to what, 1992? The policy and the only policy was issued in 1992. So clearly at that point they wouldn't have any notice about this 1994 problem because the negligence of 1996 occurred. But I guess what troubles me about your argument is, and maybe this displays my ignorance of claims made insurance law, I thought people in the industry know that under a claims made policy, you better give your insurer immediate notice if you think that you might be suffering a potential claim in order to make sure that you're going to have an insurance coverage determination in your favor. This policy, that's why the policy is so bad. It doesn't work. And it's, again, in the district court, the same question was posed. But you have to make a claim, right? But had we given notice in 1996 when we had an inkling, I didn't believe, personally, I was the one thinking about the possibility of us having a claim from our principal. I didn't think we would have because I thought we would prevail because this was a hoax. This whole thing was a hoax. But that's neither here nor there. Had we given notice to St. Paul, it wouldn't have made any difference. We would not have preserved our coverage. Nothing in this policy would have preserved our coverage had I or someone else communicated with St. Paul in 1996 when this whole thing started and said, fellas, we think there may be a claim here. We really think we'll prevail because this is a fraud. And we think we'll be able to go to the court in California and win against the Taiwanese shipper so that we'll sort of have him in a, we'll checkmate him, so to speak. That was my feeling, that it was such an obvious fraud that there would never be a claim because our principal would never lose. We were surprised in that respect because we got dismissed in the district court here, so we never had our chance. But it doesn't make any difference what I thought. It doesn't make any difference what I told St. Paul. We still would not have had coverage. Why not? That's the way the policy is written, according to St. Paul. Tell me, if you could, why you wouldn't have had coverage under Clause B by meeting that requirement of providing information about potential claims. There is no requirement of providing information about potential claims. Coverage B is black and white, flat, unforgiving. Under Coverage B, if the act and the claim are in different years, and this is St. Paul's interpretation, if the act and the claim are in different policy periods, and when this policy took effect, according to St. Paul, that's evergreen and renews every year, we had reasonably, reasonable, we could have reasonably foreseen there would be a claim we lose. There is no notice. There's no savings clause. That's why it's so ridiculous. If you had said, look, our current or whoever just got sued, and we think there's a possibility that we might get sued, St. Paul, obviously there's no claim being made at that time. Right. So there's nothing. We had no coverage. Or anything else. So the following year, when in fact the claim is made. Well, it was a couple years. I know, but just the next year when the claim is made and you go to them, they have, you're making the claim. They have no ability then to tell you, oh, well, you never, you know, it was, we're not going to cover this. Yes, they do. I mean, let's follow the way St. Paul reads it. We're out in the ballpark. You're saying that because the claim, the act and the claim do not appear and occur in the same year. Right. You're saying that once you have knowledge of a potential claim, you lose coverage because the coverage only applies if you have no knowledge. Right. That's St. Paul's position. That's the way they read it. That's why they denied our claim. Frankly, I mean, I don't want to go overboard with this. We think it's ridiculous. But it's also true. Let's look at it from another perspective. During this period of time, you're negotiating reductions in your premium. No. The premium started when this policy, this is the only policy, remember. There's just one. It's got one number. Can you dispute as to whether this is one policy or several policies? Well, the district court said it was several contracts. That's true. But there's only one policy. And I think we've made it clear in the brief what policy means. Therefore, the words this policy in this coverage provision must mean just this one, not the renewal certificate, which itself refers to the one policy number. And it says, it refers to, excuse me, I'm looking at the declarations page on the policy itself, which uses the words this policy twice. This is from the only policy. All throughout the policy, it refers to this policy, this policy, this policy maybe 25 times. So when it uses the words this policy in this coverage clause, we think it's pretty clear to anyone that it means a 1992 document. I'm afraid I got off of your question, which I never want to do. Can we go back to? Well, I asked you about the negotiated premiums, the reduction in premiums that are going on during renewal period. We started paying $7,000 in 1992. I believe there was one reduction. And that was for the 1998 policy. The premium was reduced to $18,000. So there weren't reductions going on. There was one reduction. But it's interesting when you look at the 1998 renewal certificate to interpret, which the district court didn't do any of this. The district court just jumped to a conclusion based on ABS case and the Roy case. But if you look at the renewal certificate, which the district court labeled, dubbed this policy, it had to. Because what we're talking about is what was foreseen at the time this policy took effect. This report says, well, this policy means this. One page. The thing he's talking about itself says the premium is amended to $18,000, which tells you that there aren't a number of policies. There's only one. And the premium is amended. The renewal certificate that the district court dubbed as this policy also refers to the policy number in the upper right-hand corner. And that is the policy number of the 1992 policy. And also, the renewal certificate talks about the above-numbered policy is renewed. This case is solely the same number. There was only one policy. So, we're afraid the district court may have been derailed because it looked like that in the argument by this lack of notice. And now with St. Paul's Ploy, they're trying to throughout the brief, well, they didn't give us notice, they didn't give us notice. It doesn't make any difference if they didn't give us notice. We were skewered by the fact that our principal did not make their claim until 1998. Now, St. Paul's interpretation is too bad. You see, St. Paul's interpretation would encourage, what do I call it, baritrary? All I had to do, if anybody had any idea, and no one did, that St. Paul would come up with this, all I had to do was pick up the phone in July 1996 and tell him, hey, make your claim. That's a thing of coverage. All I had to do when I was in Tokyo in August 1996 for five days talking about all these things, including this Taiwan claim, was say, hey, make your claim. I didn't do that. I wouldn't have done it because I would consider it unethical, but I had no idea that it was of the least importance. Because we never dreamed that paying premiums for seven years, we could be at the mercy, at the whim of when a claim was made. We got a text in June, July 1996 that, hey, do you guys have insurance for this? Nobody answered. All we had to do was go back and say, well, if we had any idea that St. Paul was going to pull this out of its hat, we would have gone back simply. We could have said, well, we have insurance if you make a claim this year. Now, that's no way to run a railroad. Either you have coverage or you don't have coverage. And this reasonably foreseeable thing, which we fought out in a district court, is hopeless. Now, the question is, how are you going to prove to a jury, and it should have been the jury, not the judge, but we're not appealing that, how are you going to prove to a judge or a jury what your mind was, what your state of mind was in 1996 and 1997. My state of mind, and I said it to the primary insurer in December 1997, we don't think we're going to get a claim. I put it in writing. It's in the record. The reason I said that was I thought we were going to plobber these people in the California district court, because even their own customer said it was a joke. We got it in his deposition. He said this is ridiculous. When these guys came over from China and said they didn't know that these 38 containers, they had shipped 110 in this period, and they'd all been delivered. We sat down, and they said, where are those 38 containers? He said in his deposition, they had to be kidding, because everybody knew that these containers came in, and they were delivered. So, the claim was a joke, but they went to Taiwan, where our principal ships call, and they got somebody to give them a judgment. Once they got that Taiwan judgment, unless we could get a judgment against them in California, and that ship called, bingo, they arrested it. Our principal had to pay the $1.5 million, because when we lost the forum nonconvenience motion here in California, that was in 1998. We were still fooling around in the district court in spring of 1998. I've got the docket sheet. We were still there in February. I've got the first page. We were still there in March, and I don't know exactly when the district court finally kicked us out. But anyway, the first time I thought that we were dead was when we were kicked out of the California court. Well, OK, so that's my state of mind, but I can't convince the jury that that involves me under this language that I couldn't reasonably have foreseen. What does that mean? You're never going to win that one. It just might as well not be in there. If you do a negligent act, and unless you're unaware of it, totally unaware, as long as you know you did it, you're dead. You're not going to be able to go to a judge or a jury and say, well, yeah, I knew I did something wrong, but I didn't really think that we could forget it. It wasn't going to happen. We never should have even pursued it. The point is, this policy provision leaves you with no way to protect yourself. We had no idea it was going to be interpreted like that by the lawyers or the claims people. St. Paul's underwriter had no idea, it's all on the record, that it was going to be interpreted that way. I'm running out of time. Well, yeah, but my question is, that sounds an awful lot like an unconscionability argument. But we lost that. Which was lost and not appealed. Well, I know, but it sounds like it. So why is it other than that? I mean, it's purely an interpretation of this clause in the policy. We're interpreting, and that's what I'm trying to, St. Paul's trying to make it something else. We're only interpreting this language. That's all we're doing here. That's all we appealed. Because this is the winner. This is, to me, the winning part of the ruling. Unconscionability, I didn't handle it. I don't know how good our case was. To me, this is obvious. Now, we didn't get into the differences in the California courts. Some of them say, you know, in applying the tests, whether claiming an ambiguity is enough or alleging an ambiguity. I don't think we even get to an ambiguity. I don't think this clause is ambiguous at all. I think this policy means this policy. And that clause was put in there so that when you made the application and got the policy the first time, you were under the gun. If you didn't tell them something, and later on there's a claim, and they find out that there was something that you could have reasonably foreseen before the policy was made. Doesn't that convert your policy into an occurrence policy? We had occurrence policies with St. Paul, and they changed their underwriting. Why doesn't your take on the clause actually convert it into an occurrence policy? That is, no matter when the occurrence occurred, the incident occurred, so long as there was coverage during that year, then whenever I make the claim, it doesn't matter. Well, that's the way coverage B reads. That's coverage provision B. So it's not a claims-made policy. Well, it's a claims-made policy in the sense that they took it upon themselves to put a coverage provision in there that said, You can have the act, and you can have the claim in different years, and you're covered unless when the policy first took effect. Unless when this policy took effect, you knew there might be a claim. Well, that's what it says. Thank you. Good morning, Your Honor. Samuel Ruby for the respondent. May it please the Court, I think what I'd like to do is address the notice issue, since there was some discussion of that, but I'll submit that there are, I think the key issue is something else, and I want to get to that as well. Regarding the notice issue, Mr. Mead is incorrect when he says there is no notice requirement in the policy. In Chapter 37 of the excerpts of record, the entire policy is attached to the Declaration of Joseph McBride, an underwriter in this case. On page 3 of the policy form, there is a section titled Conditions. Condition number 2 of the policy form reads, As soon as practicable, notice must be given to the company on insured receiving information as to his alleged negligent act, error, or omission with full particulars of any claim arising therefrom. In other words, the insured did have an obligation to report awareness of circumstances that could lead to a claim, not simply to report actual claims. The policy anticipates that as soon as there is even a whiff of a problem, that information will be shared with the underwriter so that the underwriter can take appropriate steps to monitor the situation and become involved if necessary. So how can you explain then, in response to your opponent's argument, the language in 1B? If I understood Mr. B's argument correctly, what he was saying is that you're taking the position that there is no coverage for a claim made in 1998 because had the insured given you notice that there might be a claim made, let's say on January 1 of 1998, it would have been ineffective. Certainly by 1998, the damage in this case had already been done. What sticks in the cross, St. Paul, so to speak, in this case, is that we have an insured, which the district court found, and this is an unchallenged ruling on appeal, the district court found that as early as 1996, K-Line America knew or should have known that there was a basis for a claim arising out of the events at issue. So what would have been the consequence had they told you? Well, first of all, St. Paul would not have agreed to the premium reduction two years later based on the nondisclosure of a pending claim. What Mr. Mead is trying to do here is, not Mr. Mead, but K-Line America, is look at what happened and ignore what might have happened if the notice had been given. And that's a key point. He's asking this court to presume, without any evidentiary record whatsoever, that if notice had been given in 1996 or even 1997, we would be in the same position here today. That is, St. Paul would be denying coverage. But we don't know that. If this claim had been disclosed to St. Paul in a timely fashion, we don't know what the terms and conditions of the policy would have been after that. And certainly if K-Line had disclosed the claim, and then at some later date, or potential claim, and if at some later date St. Paul had tried to then deny coverage, K-Line would have had a pretty good estoppel argument or a waiver argument. I'm still struggling with the language of the policy that you drafted, or your client drafted. As I read that, let's assume that K-Line had given written notice in 1996, we've got a problem with these containers. Now the claim comes in in 1998, and as I read this language in B, at that point the insured had knowledge, or could have reasonably foreseen, that that prior incident could give rise to a claim. And yet the year in which the claim arises, 1998, I guess their argument is you would deny coverage because they had prior knowledge. It seems kind of circular, but that's what the language seems to read. You are correct. That is how the language of the policy in 1998 would be interpreted. However, what St. Paul is saying is we would not have, circumstances would have been different by 1998 if we had been given notice. Either the policy form... Well, the circumstances would be you would have charged them a higher premium. I understand that. But how would the circumstances have been different with regard to the coverage determination? Well, either this issue of the so-called gap in coverage would have come to light at that point in time, and something would have been negotiated, or St. Paul would have either told the insured, we are going to cover this claim when it comes in if you renew, and that would have been a binding agreement, and the premium might have been adjusted accordingly. It certainly probably would not have been reduced, and let's keep that in mind. This was a reduction that K-Line asked for when it knew about the potential claim without disclosing that to St. Paul. So, to sum it up, at St. Paul's position, we wouldn't be here today denying coverage if they had given timely notice, either because we would have amended the policy to adjust for the situation, or we would have included it in the renewal terms, and everyone would have had full disclosure of what they were getting into. How many, is there just one policy? No, no. And that, I think that's the key issue here. That's what I wanted to get to. I heard Mr. Mead concede that there are separate contracts. In other words, each year that this policy was supposedly renewed, that created a new contract of insurance. I didn't hear him say that. I heard him say there was one policy that started in 19- Yes, but separate contracts. Separate contracts. How can you have one continuous policy but separate contracts? Well, let me take it from the top then. The, yeah, the language in question is this phrase, at the time this policy took effect. And the word that K-Line is asserting to be ambiguous in that phrase is the word policy. What are we referring to by the term policy? Well, the California Supreme Court has established very clear rules for interpreting contracts. First, we go by the clear and explicit meaning of the language. If it's clear and explicit, it governs. That's the end of the analysis. The clear, to determine the clear and explicit meaning, we first look to the plain and ordinary sense of the language. Now, I will grant that if you take the word policy, pluck it out of context and say, what could the plain and ordinary meaning of that term be? You can come up with two interpretations. One is, the policy is the contract. We often talk about, in the case law, in ordinary commonplace discussion, when we refer to a policy of insurance, we're talking about a contract. And a contract, of course, is a bundle of rights and obligations. It's almost a legal entity unto itself. But we also refer to the policy sometimes as the physical document that embodies that contract. We have the same problem with the word contract. You can talk about a contract, and you can mean the bundle of rights, or you can mean the piece of paper that supposedly reflects the rights and obligations. So you have these two meanings in the abstract. And what Kayline would like to do is conclude, at this point in the analysis, that the language must be ambiguous, and then proceed to rules for resolving ambiguities. The problem is, the California Supreme Court says that's not how we interpret contracts. You cannot find an ambiguity in the abstract. You must always construe language in the context in which it appears. And the case that says that the best is the Bank of the West case. You know, it seems to me that what Kayline is really saying is the opposite. They're saying, policy is policy. And you're saying, well, yes, except for the fact that our conduct makes it clear that what we really meant to do was either extend it, the policy, when we entered into a declaration, or change the construct, that is, have a new policy when we renew. So that sounds to me like it's an ambiguous term, that you're asking to be construed based upon the conduct of the parties to be something other than what it appears to be on its face, which is the same animal, because it's numbered the same, and the references are all the same, and it's to that animal. All right. I think you can approach this issue in one of two ways. You can start with saying, how many contracts are there? And then say, what is the phrase, this policy? Why don't we start there? Why not just start with, say, this policy? You've got to fess up before this policy. Well, and that's the approach I'm actually trying to take here today, which is to say, this policy in the abstract could mean this piece of paper that we gave you in 1992. Or it could mean this contract. And my argument to you today is, and it's been all along, that the better interpretation is that policy means contract in this context. Just try it the other way. If policy means piece of paper, and you plug that back into that paragraph, what you're left with is a phrase that says, at the time, this piece of paper took effect. Well, pieces of paper don't take effect. Contracts take effect. And if you read that phrase to say, when this contract took effect, that's a much more natural, reasonable, plausible interpretation. There are other contextual clues here that should not be missed. In the same paragraph, this is Clause B of the Condition and Issue, there's a reference to a policy period. So there's that term policy again. How are we going to interpret that? Well, if you read that to be contract period, it makes a lot of sense. If you try to read it some other way, it doesn't. So our position is that when you read the phrase, this policy, in context, the only reasonable interpretation of that phrase is that it means this contract. That then begs the question, how many contracts do you have? What is this contract? And, again, I believe it was conceded here today, and it's been conceded in the proceedings below that there were several separate contracts. I'll restate the analysis briefly just to go over it. Under the ABS case, as well as the Karen Kane case decided by this circuit, there is a presumption that when parties enter into a renewal of an insurance policy, they create a separate contract. Unless there is clear and convincing evidence rebutting that presumption and establishing that there was one continuous contract. Here, we get the presumption. We also think the evidence is on our side. I have a question on that. You know, that principle came down in cases which are almost a foot high of this one. That is, the incentive there was for the insurer to take the opposite position and this is an employment coverage situation. So, does the same principle apply here? Absolutely. The ABS case involved, the specific issue was coverage under an employee dishonesty coverage. But that coverage was only one section of a general commercial liability policy, and in the statement of facts in that case, it's made clear. They did not have a stand-alone fidelity bond or something at issue. This was, in fact, a general liability policy, just had different coverage sections. And the court has been clear over the years that they do not take conflicting interpretations simply based on who it's going to favor in a particular circumstance. There could be circumstances where the insured would have one interest in proving a continuous contract. There could be another circumstance where they have quite the other interest and the court's not going to say, well, we'll see what the insured wants and that's what we'll give him. So, I think those cases are on point. And then we need to look at the evidence in the record. And what Kayline has pointed to is the fact that, yes, there was one policy number, there was one physical policy issue. But there's no evidence that explains the significance, if any, of those two facts. What we have here is an obscure type of policy written very infrequently. And there's no evidence in the record that would meet this clear and convincing standard that somehow there's a practice in the industry that you usually issue separate contracts, you usually give them separate numbers, and that by not doing that here, we somehow intended to enter into a continuous contract. Let me interrupt for just a second. Given your interpretation of the, or your definition of policy, if Cam had provided notice of Dodson's allegations to St. Paul prior to 1998, would Cam have coverage under Clause B with respect to Triple K's claims? Well, if Clause B survived at that point, then under, in other words, if despite having been given notice, St. Paul decided to issue the same policy, then it may be true that under the policy they would not have coverage. But having been given notice and an opportunity to negotiate over the potential claims, St. Paul would not be in this position today. Essentially, under that interpretation, Clause B extends no greater coverage than Clause A. In other words, you have to essentially have a notice of the claim and the claim made within the same contract period, which in this case, the original was six months. Yes. How often in real life does that happen? Oh, not often, Your Honor. But the California Court of Appeals said in the Maryland Seeley case, reviewing a very restrictive type of claims made coverage, found that those conditions were valid and enforceable. The fact that they were not very advantageous to the insurer did not mean that the court was going to rewrite the contract to give them better terms. Similarly, she came before this Court, and I believe it was the Burns case, which was a claims made and reported policy, where the claim has to be made and reported to the insurer within the same policy period, and based on California law, this court enforced that policy. And in these decisions, the courts have been very clear. They said, we don't think these policies are very well written. Obviously, the insurer would be well-suited to look for a different type of policy, but they weren't going to rewrite the contract. And that's our position here. Mr. Ridley, how do you square ABS with our decision in United Association? Well, I don't know that that case has been cited in the briefing, Your Honor, so I'd have to confess I'm not. That 790 F. 2nd 1428 is the Ninth Circuit 1886 decision. As I read it, it appears to be in some tension with ABS on the question of contract interpretation, if we find an ambiguity. Well, again, I haven't read the case. I can tell you from the dates, though, that the 1986 case, well, ABS came down in 1995, so I would argue that perhaps that other case would warrant some reconsideration in light of the subsequent ABS decision. Well, the problem it poses for us is that it's a Ninth Circuit case, and ABS is a California case. The other point I would raise, Your Honor, is that the Karen Kane case, which was a decision of this court, decided in the year 2000. Specifically, the courts found ABS to be a persuasive statement of California law. So I would submit that Karen Kane would resolve any concerns about the 1986 case. I'm running out of time here. Let me get to a couple other points. Well, Mr. Mead asserted that Kayline is not appealing the decision below regarding the factual issue of whether Kayline had or did not have knowledge of the circumstances at various points in time. But he then spent five minutes, I think, kind of arguing that point and making various representations about his state of mind and the events and so forth. I believe that issue is not presented for appeal. It was not briefed. It should not be disturbed. If the court disagrees, you can certainly review all the briefing in the case below, but I'm not going to, in my limited time, try to address all those arguments. Finally, there's another issue in this case. That is a bad faith claim that was asserted against St. Paul. And bad faith under California law, it's akin to a tort. It consists of two elements. First, you have to show that the insurer wrongfully denied benefits, in other words, made a bad coverage decision. And number two, that the insurer did so egregiously. That is, did so unreasonably. And such a bad faith claim was made against St. Paul in this case. In the proceedings below, we specifically moved for some re-adjudication of that issue, asked the court to throw it out on two grounds. First, because our coverage position was correct. But also, even if it was incorrect, it was at least reasonable. And that under the Ninth Circuit authority, such as the Guevara case that was cited in the proceedings below, because it was at least a reasonable position, because there was at least a genuine dispute as to coverage, that claim should be dismissed, even if St. Paul was wrong about coverage. That issue was briefed in our moving papers. We received no opposition to it. We brought it up again in our reply papers and specifically asked the court to find a genuine dispute as an alternative basis to dismissing the bad faith claim. The court did so in its order, which is Chapter 74 of the Excerpts of Record. Towards the end of the court's order, the court dismisses the bad faith claim on two grounds. First, that the coverage position was correct. But second, that it was at least, there was at least a genuine dispute. And therefore, on that alternative ground, it should be dismissed. The genuine dispute issue has not been appealed in this case. Kingline says in its reply brief before this court that somehow the bad faith claim is at issue  But even if this court were to reverse the district court on the contract interpretation issue, the bad faith claim would stand on the alternative ground of a finding of a genuine dispute. The issue has not been challenged on appeal. Kingline has not briefed it. And so we would submit that in the worst case, this court should still affirm the dismissal of the bad faith claim. And with that, I would submit. OK, thank you very much. We're not going to pursue the bad faith claim. We waive it. St. Paul never raised this notice idea before. They did not deny the claim on that basis. Condition two is headed notice of claim or suit. They wrote it. It also says alleged negative act, which, if you read it, means somebody is alleging it. Meaning somebody is making a claim. So I want to get off on this too much because it distracts from the issue in the case. But there was no requirement of notice. And even if we had given notice, everything St. Paul says is would have could have should have. Speculation of what they might have done and what they might have done for us. That's not what we're talking about in this case. We're talking about one thing here. That is the interpretation of the 1992 piece of paper. And it has to be as of 1992, because all the cases, regardless, they may take a little different approaches. And there may be some little different aspects to the way they put it. But you're looking for the party's intent. That's in 1992. You don't even know if there's going to be a renewal policy with a renewal certificate. Ever again. You have to interpret that policy in 1992, those words, standing on their own feet in 1992. The objectively reasonable expectations test is, of course, only as of 1992. So you can't get off into all these different contexts. I understand. I thought you would. Thank you. The only other thing I'd say is a B.S. Thank you. Thank you. Just made in the matter. Just argue will be submitted. We'll see him recess for a few minutes.
judges: Rymer, Tallman, Leighton